UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES B. GILL, SR.,

                Plaintiff,

     v.                                      Case No. 23-cv-256-pp

JOSEPH TEIGEN, *et al.*,

                Defendants.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 132), GRANTING DEFENDANTS WILLSON AND BEAUVAIS'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 161) AND DISMISSING CASE**

---

Plaintiff Charles B. Gill, Sr., who is incarcerated and is representing himself, is proceeding under 42 U.S.C. §1983 on various claims against state officials. The plaintiff has moved for summary judgment against the remaining defendants, and each defendant or set of defendants has both responded and filed their own cross-motion for summary judgment.

This order addresses the plaintiff's motion for partial summary judgment against Lieutenants Lance Willson and Chad Beauvais, dkt. no. 132, and defendants Willson and Beauvais's cross-motion for summary judgment, dkt. no. 161. Defendants Willson and Beauvais are entitled to qualified immunity from the plaintiff's Sixth Amendment claim. The court grants their motion for judgment as a matter of law and denies the plaintiff's motion for partial summary judgment. Because there are no remaining defendants or claims, the court will dismiss the case.

Case 2:23-cv-00256-PP    Filed 06/23/25    Page 1 of 42    Document 195

## I. Facts

### A. Procedural Background[1]

On August 19, 2024, the court issued an amended scheduling order setting new deadlines for the remaining parties to complete discovery and file dispositive motions on the merits of the plaintiff's remaining claims. Dkt. No. 93. On September 3, 2024, the court received a copy of a letter from the plaintiff, addressed to counsel for defendants Willson and Beauvais, in which he said that counsel had failed to produce documents that he had requested "within the 30 day time limit." Dkt. No. 94. The plaintiff did not explain why he sent a copy of this letter to the court, and the court took no action on it.

But on October 16, 2024, the court received from the plaintiff a motion to compel discovery against Willson and Beauvais. Dkt. No. 99. On November 6, 2024, counsel for Willson and Beauvais responded, notifying the court that the parties had reached "an agreement" and that the plaintiff was withdrawing his motion to compel. Dkt. No. 104. On November 12, 2024, the court received from the plaintiff a letter in which he confirmed that he wanted to withdraw his motion to compel. Dkt. No. 107. The court granted that motion and ordered that the plaintiff's motion to compel was deemed withdrawn. Dkt. No. 108.

On November 14, 2024, defendants Schubart, Willson and Beauvais filed a joint motion for an extension of the deadlines for discovery and dispositive

---

[1] This section addresses the procedural history of the case only as it pertains to defendants Willson and Beauvais because the court previously issued an order granting partial summary judgment for the Wisconsin Department of Corrections (DOC). Dkt. No. 90.

motions. Dkt. No. 109. The court granted that motion, extended the discovery deadline to December 30, 2024 and extended the dispositive motion deadline to January 29, 2025. Dkt. No. 112.

On December 10, 2024, the court received the plaintiff's motion for partial summary judgment against Willson and Beauvais (although the motion is dated November 7, 2024). Dkt. No. 132. On December 27, 2024, before the defendants had responded to the plaintiff's motion, and before their response was due, the court received the plaintiff's "reply brief" and declaration in support. Dkt. Nos. 151, 152. The plaintiff asserted that Willson and Beauvais had "failed to reply to the plaintiff's motion for summary judgment in a timely manner," and he asked the court to consider his proposed facts to be undisputed and "to grant his unopposed motion for summary judgment." Dkt. No. 151. The plaintiff explained that he had mailed his motion to the Clerk of Court on November 7, 2024. Id. at 1. But as the court has explained, the court did not receive the plaintiff's motion and did not serve the motion on the defendants until December 10, 2024; that means the defendants' response was not due until thirty days from December 10, 2024—in other words, by January 9, 2025. See Civil Local Rule 56(b)(2) (E.D. Wis.).

On January 6, 2025, the court granted Willson and Beauvais's motion for an extension of time and extended their deadline to respond to the plaintiff's motion to January 29, 2025, which the court observed "also is their deadline to file their own dispositive motions." Dkt. No. 155. The court encouraged the defendants "to file a single joint motion and response to the plaintiff's motion

for summary judgment." Id. At the January 29, 2025 deadline, the court received Willson and Beauvais's joint motion for summary judgment and response to the plaintiff's motion for summary judgment. Dkt. Nos. 161, 168.[2]

On February 3, 2025, the court extended to March 28, 2025 the plaintiff's deadline to file his combined response to Willson and Beauvais's motion for summary judgment and his reply in support of his own motion. Dkt. No. 173. On February 14, 2025, the court received the plaintiff's second reply brief and materials in support of his motion for partial summary judgment and his response to the defendants' motion for summary judgment. Dkt. Nos. 175–177. On February 28, 2025, the defendants filed their reply materials in support of their motion for summary judgment. Dkt. Nos. 182–184.

On March 4, 2025, the court received the plaintiff's motion for leave to file a sur-reply to Willson and Beauvais's reply brief. Dkt. No. 185. The plaintiff sought leave to file a sur-reply to submit "evidence that was already submitted by [him] and the defendants to better clarify [his] argument." Id. The next day, the court denied this motion because the plaintiff did not offer a valid explanation such as "allowing a party to respond to new arguments raised in the reply brief," for why he needed to file a sur-reply, Dkt. No. 186 (citing Watt v. Brown County, 210 F. Supp. 3d 1078, 1082 (E.D. Wis. 2016)). The court explained that Willson and Beauvais "did not raise new arguments in their

---

[2] Because the defendants timely responded to the plaintiff's motion for summary judgment, the court will not consider the plaintiff's facts to be undisputed or his motion to be unopposed.

4

reply brief but merely responded to the plaintiff's brief in opposition and maintained the position that they are entitled to summary judgment." Id.

On April 16, 2025, the court received from the plaintiff a copy of another letter that he had sent to counsel for defendants Willson and Beauvais. Dkt. No. 189. The letter says that on April 9, 2025, the plaintiff received legal documents from defense counsel dated January 29, 2025—seventy days after counsel sent those documents to the plaintiff at Stanley Correctional Institution—and that he had received them at Oshkosh Correctional Institution after he was transferred there. Id. The documents included the defendants' motion for summary judgment and materials filed in support of that motion. Dkt. No. 189-1. Again, the plaintiff did not explain why he sent a copy of this letter to the court or whether he wanted the court to take any action on it.

The court can conclude that the documents the plaintiff received late are the original copies of the defendants' motion for summary judgment and materials in support that defense counsel had sent to the plaintiff on January 29, 2025, while he was incarcerated at Stanley. See Dkt. No. 169 (Certificate of Service of documents on the plaintiff at Stanley). The day after defense counsel sent those documents to the plaintiff, the plaintiff notified counsel and the court that he had been transferred to Oshkosh. Dkt. No. 170. The day after that—January 31, 2025—defense counsel amended their certificate of service to show that the documents had been re-sent to the plaintiff at Oshkosh. Dkt. No. 171.

The court suspects that after his transfer to Oshkosh, the original copy of the defendants' documents arrived at Stanley and that the staff at Stanley simply changed the address on the envelope and forwarded the envelope to the plaintiff at Oshkosh. The plaintiff included with his letter a copy of the front of the defendants' mailing envelope, which shows a sticker with the address for Oshkosh pasted on top of the plaintiff's address. Dkt. No. 189-2. This delay in the plaintiff's receipt of the defendants' motion and documents in support is understandable given the plaintiff's transfer only one day after defense counsel mailed these documents to him (though it is not clear why it took seventy days for the plaintiff to receive them at Oshkosh).

But the court is aware that the plaintiff timely received the second copy of the defendants' motion for summary judgment and supporting materials that they sent to him at Oshkosh on January 31, 2025, because he has responded to the defendants' motion and filed his reply materials in support of his own motion. That means the delay in the plaintiff receiving the original copy of the documents sent to him at Stanley on January 29, 2025 did not cause him any prejudice. The court will not take any action on the plaintiff's April 16, 2025 letter, dkt. no. 189, which merely documents the difficulties the court and counsel sometimes face in sending papers to incarcerated persons, particularly when they are moved from one institution to another.

B.    <u>Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 132)</u>

In the screening order, the court allowed the plaintiff to proceed on his "sparse" allegations that Willson and Beauvais violated his Sixth Amendment

right to counsel when they "ignored or disregarded his requests to contact his attorney" after the Outagamie Sheriff's Department blocked his PIN number for making phone calls. Dkt. No. 14 at 14–15. The court explained that the plaintiff had "not alleged that the lieutenants restricted his phone access; he says only that his PIN to make phone calls did not work." Id. at 14. The plaintiff had alleged only that Willson and Beauvais had ignored his requests "to write to his attorney consistent with Outagamie County Jail procedures." Id. at 6. The court did not allow the plaintiff to proceed on a First Amendment claim against Willson and Beauvais regarding Outagamie County Jail staff's denial of his grievances or his allegations that staff transferred him to Brown County in retaliation for his grievances. Id. at 15–16.

This is the plaintiff's second motion for partial summary judgment on his Sixth Amendment claim against defendants Willson and Beauvais. On January 11, 2024, the plaintiff filed his first motion. Dkt. No. 44. On July 24, 2024, the court issued an order denying the plaintiff's motion because the parties' "evidence and declarations reveal genuine disputes of material fact regarding whether, despite his phone restriction, the plaintiff had reasonable access to his attorney from January 25 through February 1, 2023." Dkt. No. 90 at 16. The court found that a "reasonable jury could credit either side's evidence and believe either side's version of the events—that the plaintiff was unable to speak with his attorney at all for the full seven days of his phone restriction, or that the plaintiff had ways to write to, contact and call his attorney but failed to follow the jail's procedures for requesting them." Id. Because a reasonable jury

"could reach either conclusion," the court found that summary judgment was inappropriate and denied the plaintiff's motion. Id. The court explained that it had not allowed the plaintiff to proceed on a claim "'that Outagamie's telephone policy amounts to an unconstitutional denial of meaningful access to the courts.'" Id. at 17 (quoting Dkt. No. 76 at 3). Because the court "did not allow the plaintiff to proceed on an access-to-courts claim, which usually arises under the First or Fourteenth Amendment and not the Sixth Amendment," the court did not "address the parties' assertions" about this potential claim. Id.

In their present summary judgment motion, the defendants briefly mention the plaintiff's first, denied summary judgment motion. Dkt. No. 168 at 2. But neither party discusses at length the previous motion or the court's decision. The court has discretion to "allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist." Whitford v. Boglino, 63 F.3d 527, 530 (7th Cir. 1995). Allowing a party to file a successive motion for summary judgment "is essentially a decision concerning case management, and district court judges are in the best position to make such decisions." Gordon v. Veneman, 61 F. App'x 296, 298 (7th Cir. 2003) (citing Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002)). "Good reasons" to allow a renewed or successive motion for summary judgment include "'(1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct a clear error or prevent manifest injustice.'" Whitford, 63 F.3d at 530 (quoting Kern–Tulare Water Dist. v. City of Bakersfield, 634 F. Supp. 656, 665

(E.D. Cal. 1986), aff'd in part, rev'd in part on other grounds, 828 F.2d 514 (9th

Cir. 1987)).

The plaintiff has not explained why the court should consider his second

motion for summary judgment against Willson and Beauvais. His legal theory

has not changed, he has not asserted that he has new evidence that was not

previously available and he has not asserted that the court committed clear

error in its decision denying his first motion for summary judgment. Instead,

the plaintiff's brief contains verbatim reproductions of arguments he made in

his brief in support of his first motion for summary judgment on his Sixth

Amendment claims. Compare, e.g., Dkt. No. 45 at 2

> This very Court, The Seventh Circuit Court has held that
> "restrictions on detainee's telephone privileges that prevent him
> from contacting his attorney violate the Sixth Amendment right to
> counsel." Murphy v. Walker, 51 F.3d 714, 718 (7th Cir. 1995) (citing
> Tucker v. Randall, 948 F.2d 388, 390-91 (7th Cir. 1991) ("Denying
> a pre-trial detainee a telephone for four days would violate the
> Constitution in certain circumstances. The Sixth Amendment right
> to counsel would be implicated if plaintiff was not allowed to talk to
> his lawyer for the entire four day period.") [The plaintiff] went the full
> seven days without talking to his lawyer.")

with Dkt. No. 133 at 4 (Plaintiff's Brief in Support of Second Motion for

Summary Judgment)

> This very Court, The Seventh Circuit Court has held that
> "restrictions on detainee's telephone privileges that prevent him
> from contacting his attorney violate the Sixth Amendment right to
> counsel." Murphy v. Walker, 51 F.3d 714, 718 (7th Cir. 1995) (citing
> Tucker v. Randall, 948 F.2d 388, 390-91 (7th Cir. 1991) ("Denying
> a pre-trial detainee a telephone for four days would violate the
> Constitution in certain circumstances. The Sixth Amendment right
> to counsel would be implicated if plaintiff was not allowed to talk to
> his lawyer for the entire four day period.") [The plaintiff] went the full
> seven days without talking to his lawyer."

(bolding omitted)).

The plaintiff's brief in support of his second motion cites some cases that he did not include in his first brief. See Dkt. No. 133 at 4 (citing Rodgers v. Lincoln Towing Service, Inc., 771 F.2d 194, 199 (7th Cir. 1985); Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986); Duran v. Elrod, 542 F.2d 998, 1000 (7th Cir. 1976); Montana v. Commissioners Court, 659 F.2d 19, 23 (5th Cir. 1981); and Feeley v. Sampson, 570 F.2d 364, 374 (1st Cir. 1978)). But all these cases existed before the plaintiff filed his first motion for summary judgment, and he cites them to support his argument that the Sixth Amendment "would be implicated if plaintiff was not allowed to talk to his lawyer for the entire four-day period." Id. That's merely a restatement of what the Tucker court held, which the plaintiff quoted in both briefs and which the court cited in the screening order. Dkt. No. 14 at 14. The new cases the plaintiff has added do not show an intervening change in the law, and they add nothing to his legal theory in support of his motion for summary judgment.

The plaintiff's brief in support of his second motion for summary judgment also cites cases that the plaintiff *did* cite in his brief in support of his first motion and uses identical parenthetical explanations to describe the relevance of these cases. Compare Dkt. No. 133 at 4–5 (citing Simpson v. Gallant, 231 F. Supp. 2d 341, 348-49 (D. Me. 2002); Jones v. City and County of San Francisco, 976 F. Supp. 896, 913-14 & n. 17 (N.D. Cal. 1997); Iqbal v. Hasty, 490 F.3d 143, 170 (2d Cir. 2007)); with Dkt. No. 45 at 2 (same). Both briefs even include identical typographical errors in the plaintiff's citation to

the subsequent history of the Second Circuit's decision in Iqbal. Compare Dkt. No. 45 at 2 (citing "Ashcroft v. Iqubal, )_ U.S._, 129 S.Ct. 1937 (2009)" [*sic*]; with Dkt. No. 133 at 5 (same but with bolded case name). The plaintiff's discussions of qualified immunity in each brief also effectively are identical. Compare Dkt. No. 45 at 2–3; with Dkt. No. 133 at 6. The plaintiff has not added new facts or evidence from the brief in support of his first motion for partial summary judgment; he has repurposed the arguments from his brief in support of his first motion, pasting the identical content into his brief in support of his second motion.

The court will not revisit its conclusions from the July 24, 2024 order explaining why the plaintiff was not entitled to judgment as a matter of law on his Sixth Amendment claim against defendants Willson and Beauvais. The court will exercise its discretion and will not to consider the plaintiff's second motion for partial summary judgment against Willson and Beauvais because he has not acknowledged that he previously moved for summary judgment on this claim, does not say what (if anything) is different about his second motion, he provides no reason why the court should let him make a second attempt at summary judgment for this claim and offers the same arguments and materials in support of his second motion as he offered in his first motion.

Unlike the plaintiff, defendants Willson and Beauvais did not previously move for summary judgment on the plaintiff's Sixth Amendment claim, though they did oppose his previous motion for summary judgment. Dkt. No. 74. It is in the interest of judicial efficiency to give the defendants an opportunity to

show that there is no genuine issue of material fact as to this claim. The court will consider their motion and determine whether they are entitled to judgment as a matter of law or whether a jury must decide this claim.

C.    Factual Background

The court considers the parties' proposed facts "only to the extent they are clearly and obviously supported by citations to the . . . record." Jenkins v. Syed, 781 F. App'x 543, 545 (7th Cir. 2019) (internal quotation marks omitted). The court will deem admitted any facts that the opposing party does not properly contest by citing admissible evidence in the record. See Civil L.R. 56(b)(4); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission.").

1.    *The Defendants' Proposed Facts*

While the plaintiff was at Outagamie County Jail in January 2023, the jail provided detainees a copy of its Information and Rules of Conduct (rulebook). Dkt. No. 166 at ¶1. The rulebook also was available on the jail's electronic kiosk, which required a user to acknowledge that the user had received the rulebook when the user first used the system. Id. at ¶2. The plaintiff acknowledged receipt of the rulebook on December 28, 2022. Id. at ¶3.

The rulebook provides detainees with information about contact with an attorney. Id. at ¶4. According to the rulebook, representatives from the Appleton Public Defender's Office speak with new arrestees before their initial court appearance. Id. at ¶4. Detainees also may ask to speak with a public defender by writing a request, which is placed into the public defender's mailbox at the

jail. Id. The public defender's office also accepts collect calls. Id. Detainees may submit a request to speak with a private attorney on an unrecorded call. Id. Jail staff verifies the attorney's name, address and office number and enters the provided phone number into the phone system as an unrecorded call. Id.; see Dkt. No. 165-1 at 11.

On January 11, 2023, attorney Amber Gratz filed an appearance in the plaintiff's state criminal case, State v. Gill, Outagamie County Case Number 2022CF1179. Dkt. No. 166 at ¶6; Dkt. No. 165-6. At 8:36 a.m. on January 24, 2023, the plaintiff and Gratz had an in-person professional visit that was logged into the jail's management system. Dkt. No. 166 at ¶7; Dkt. No. 165-8. The printout from the management system lists "atty amber grats" [*sic*] under the section labeled "Additional Info." Dkt. No. 165-8.

At 4:24 p.m. on January 25, 2023 (the next day), Lieutenant Beauvais saw on a camera in the jail that detainee David Saunders was using the phone. Dkt. No. 166 at ¶8; Dkt. No. 165-2 at 1. Beauvais "was aware that Inmate Saunders was on a 1 week restriction from phone privileges" because of a previous conduct report charging Saunders with improperly allowing another detainee to use his phone. Dkt. No. 165-2 at 1. Beauvais reviewed the phone record of the call and "was able to determine [that the plaintiff] allowed Inmate Saunders to use his phone account to circumvent Inmate Saunders phone restriction." Id. Beauvais prepared an incident report charging the plaintiff with misuse of phone privileges, which can result in telephone privileges being restricted or denied. Id.; Dkt. No. 166 at ¶9. The plaintiff insists that there is

no evidence to prove Beauvais's actions. Dkt. No. 177 at ¶¶8–9. But Beauvais detailed his actions and conclusions in the incident report that the defendants included with their summary judgment materials. Dkt. No. 165-2.

Based on his report about the plaintiff violating jail rules, Lieutenant Beauvais prepared a notice of disciplinary hearing and rights with a one-week phone restriction ending on February 1, 2023. Dkt. No. 166 at ¶13; Dkt. No. 165-3. Because of this violation, Beauvais either blocked or authorized a block of the plaintiff's phone PIN, pending a hearing. Dkt. No. 166 at ¶14; Dkt. No. 165-3. The block went into effect at 4:42 p.m. on January 25, 2023. Dkt. No. 166 at ¶15; Dkt. No. 70 at ¶2. Beauvais provided the plaintiff with the notice of disciplinary hearing at 5:11 p.m. the same day. Dkt. No. 166 at ¶16; Dkt. No. 165-3. The plaintiff asked for a formal hearing and waived the minimum twenty-four-hour time requirement. Dkt. No. 166 at ¶17; Dkt. No. 165-3.

Lieutenant Beauvais relies on statements in his previously submitted declaration averring that when he provided the plaintiff the notice, the plaintiff did not tell Beauvais that the plaintiff urgently needed to speak to an attorney. Dkt. No. 70 at ¶5. Beauvais avers that he never told the plaintiff that if he wanted to talk to his attorney, his only option was to write to his attorney. Id. Beauvais states that if the plaintiff had asked to contact his attorney, Beauvais would have told the plaintiff about other available options, including writing to his attorney, contacting the public defender's officer using the phone or kiosk system or submitting a request to call his attorney. Id. Beauvais avers that after January 25, 2023, he did not have any contact or involvement with the plaintiff

regarding his PIN restriction or his request to contact his attorney. Dkt. No. 163 at ¶2. The plaintiff contests the statements from Beauvais's declarations, but he cites nothing in support of his disputes. Dkt. No. 177 at ¶¶18–21.

On January 26, 2023, the plaintiff had an in-person professional visit at the jail with an attorney. Dkt. No. 166 at ¶22; Dkt. No. 165-9. The defendants say that this meeting was with Gratz, but the printout from the jail's management system that logged this visit lists only "attorney" under "Additional Info." Dkt. No. 165-9. It does not list Gratz's name, unlike the January 24, 2023 entry of Gratz's visit. Id.; Dkt. No. 165-8. The plaintiff asserts that the defendants cannot "positively say that [he] met with Amber Gratz on January 26, 2023," but he does not identify the attorney with whom he *did* meet. Dkt. No. 177 at ¶22.

The same day, the plaintiff had a hearing in his state criminal case. Dkt. No. 166 at ¶23; Dkt. No. 162-1. Attorney Gratz appeared in person for the plaintiff, who appeared by video from the jail. Dkt. No. 166 at ¶¶24–25; Dkt. No. 162-1 at 2. Counsel for defendants Willson and Beauvais avers that neither the plaintiff nor Gratz "ever indicated any issue with inability to contact each other or the ability to call certain witnesses for the hearing." Dkt. No. 162 at ¶2. In their proposed facts, the defendants assert that because the courthouse is "adjacent to the jail . . . Ms. Gratz had the opportunity to meet with" the plaintiff on January 26, 2023, "and then attend the hearing following that meeting." Dkt. No. 166 at ¶27. The defendants do not say whether Gratz did, in fact, meet with the plaintiff before the January 26 hearing, nor do they cite any evidence

showing whether she did or did not meet with the plaintiff at the jail before the hearing.

On January 27, 2023, Lieutenant Willson conducted a disciplinary hearing for the plaintiff on his charge of misuse of his phone privileges. Id. at ¶28. Willson found the plaintiff guilty of the violations and upheld the one-week phone restriction, which was scheduled to end on February 1. Id. at ¶30. The plaintiff does not contest the result of the hearing, but he denies admitting to misusing his phone privileges by dialing the phone using his PIN and then handing the phone to another detainee. Dkt. No. 177 at ¶29. Yet earlier in his response to the defendants' proposed facts, he concedes that "[a]s the defendants state[, he] dialed the phone and gave the phone to another inmate." Id. at ¶10. He insists that the rulebook does not state that he "was not allowed to dial the phone and give it to another inmate. The rules simply state do not share your pin#, and [he] did not share his pin#." Id.

Relying on his previous declaration, Willson avers that the plaintiff did not tell him during the disciplinary hearing that he had a court hearing and urgently needed to speak with his attorney. Dkt. No. 166 at ¶31; Dkt. No. 71 at ¶3. Willson avers that he did not tell the plaintiff that the plaintiff could contact his attorney only by writing a letter. Dkt. No. 166 at ¶32; Dkt. No. 71 at ¶3. Willson says that if the plaintiff had asked to talk to his attorney, Willson would have reminded the plaintiff "of the process [for speaking with his attorney] as delineated in the inmate handbook". Dkt. No. 166 at ¶33; Dkt. No.

71 at ¶3. The plaintiff disputes these statements, but again he cites no evidence in support of his disputes. Dkt. No. 177 at ¶¶31–33.

Willson avers that after the January 27, 2023 hearing, Willson did not have any contact with the plaintiff about his PIN or his request to speak with an attorney. Dkt. No. 164 at ¶2. The same day, the plaintiff completed and submitted a disciplinary appeal form about his phone restriction. Dkt. No. 166 at ¶35; Dkt. No. 165-5. The plaintiff wrote in his appeal that he had explained to Willson that "blocking [his] pin # blocks access to [his] attorney and public defenders office," but that Willson "still imposed this sanction." Dkt. No. 165-5 at 1. Captain Schmidt (not a defendant) responded to the appeal and upheld the penalty. Id. at 2. Schmidt also explained the jail's policy allowing detainees to contact their attorney by writing a letter or by providing the attorney's name and telephone number for staff to verify, and staff "can provide an exception to that number so [the plaintiff] would be able to call it." Id.

On January 29, 2023, the plaintiff placed a request with the Appleton Public Defender's office to forward a message to Attorney Gratz about a witness he wanted her to call at his upcoming preliminary hearing. Dkt. No. 166 at ¶¶38, 40; Dkt. No. 165-7. The plaintiff said in his message to Gratz that the jail had "blocked [his] pin from calling [her] and the public defender office," and he said he had been "trying to call [her] since Thursday." Dkt. No. 165-7. On January 31, 2023, the public defender's office posted a follow-up to the kiosk that says, "Good afternoon. Your message has been forwarded to Atty. Gratz." Dkt. No. 166 at ¶41; Dkt. No. 165-7. The defendants say that jail staff does not

monitor or respond to requests sent to the public defender's office. Dkt. No. 166 at ¶39. The plaintiff does not dispute that he was able to contact the public defender's office through the kiosk, but he says that he learned that he could do so from Lieutenant Evens (not a defendant). Dkt. No. 177 at ¶38. The defendants dispute that statement and recount that the plaintiff contacted the public defender's office through the kiosk on January 15, 2023, meaning that prior to his one-week phone restriction, the plaintiff was aware of the procedure for doing so. Dkt. No. 182 at ¶38; Dkt. No. 183-2. The defendants also observe that in January 2023, the plaintiff could have requested a "write out kit," which "would have included the supplies necessary to write to his attorney." Dkt. No. 183 at ¶4; Dkt. No. 183-1. They cite an exhibit showing that the plaintiff had asked for write-out kits during his past stays at the jail in 2017 and 2018 and when he was again incarcerated there in August or September 2023. Dkt. No. 183-1.

The defendants submitted a declaration from David Kiesner, Corrections Division Commander at the jail. Dkt. No. 165. Kiesner avers that restricting a detainee's PIN number "is a reasonable restriction when that inmate violates the rules and uses another inmate's pin or provides another inmate with his own pin to use." Id. at ¶18. He avers that detainees who exchange PIN numbers can create "safety and security concerns," and that the jail "needs to ensure the safety of both inmates and others by being able to monitor the telephone calls knowing the inmate with that pin number is actually making the call." Id. Kiesner explains that the jail also needs to monitor calls to ensure that detainees

comply with no-contact court orders. Id. Kiesner avers that when a detainee's phone privileges are blocked for disciplinary reasons, the detainee still can contact his attorney by writing a request to speak with a public defender or by calling the public defender's office directly. Id. at ¶16. He reiterates that if a detainee has a private attorney, he must submit the information to jail staff, who will verify the attorney's information and add their office number to the phone system as an unrecorded call. Id. Kiesner avers that these procedures apply even if a detainee has a PIN restriction on his phone privileges. Id. at ¶¶16, 19.

The plaintiff disputes that he was able to call the public defender's office while he was on the one-week phone restriction. Dkt. No. 177 at ¶42. He cites a detailed call log that the defendants submitted with their exhibits. Dkt. No. 165-11. This call log shows that from January 25 to February 1, 2023, the plaintiff attempted fourteen times to call the public defender's office at (920) 832-2774. Id. Of those attempts, thirteen did not go through, and the call log lists the result of the call as "PIN disabled." Id. The plaintiff's fourteenth call to the public defenders' office was on February 1, 2023, but the call log lists the result of this call as "Inmate hungup." Id. The plaintiff contests Kiesner's account of the other ways a detainee can contact his attorney when his PIN is blocked, and he asserts that not all detainees are aware of the methods that Kiesner lists because they are not in the rulebook. Dkt. No. 177 at ¶¶46–47, 49. He also reiterates that Willson and Beauvais told him to "write [his] attorney" when he told them that Gratz was his appointed attorney. Id. at ¶48. He again cites no evidence in support of his statements and disputes.

19

Kiesner avers that there is no documentation in the plaintiff's jail file showing that while the plaintiff's PIN was restricted from January 25 through February 1, 2023, he submitted a written request to speak with Attorney Gratz or provided jail staff her name and phone number to verify through a written request or through the kiosk. Dkt. No. 165 at ¶17. Kiesner says that phone records also show that the plaintiff did not make any attempted calls to his attorney while his PIN was restricted. Id. at ¶15; Dkt. No. 165-11. The plaintiff concedes that he did not try to call Gratz but says that that is because the public defender's office had appointed her to represent him. Dkt. No. 177 at ¶52. He says that he instead tried to contact Gratz by calling the public defender's office, but as the court has explained, his call record shows that his calls to the public defender's office were blocked while he had the PIN restriction. Id.; Dkt. No. 165-11.

On the morning of February 1, 2023, the plaintiff had an in-person meeting with Gratz at the jail. Dkt. No. 166 at ¶53; Dkt. No. 165-10. The record of this visit in the jail's management system states "Attorney Amber Gratz" under the "Additional Info" section. Dkt. No. 165-10. Later that day, the plaintiff again was able to make phone calls using his PIN. Dkt. No. 166 at ¶54. On February 2, 2023, the plaintiff was transferred to the Brown County Jail. Id. at ¶55; Dkt. No. 162-2 at 3. He had a preliminary hearing in his state criminal case the next day. Dkt. No. 166 at ¶56; Dkt. No. 162-2. Neither the plaintiff nor Gratz mentioned the plaintiff's phone restriction during that

hearing or stated that they were hindered from preparing for the hearing because of the restriction. Dkt. No. 166 at ¶58.

2. *The Plaintiff's Declaration*

The plaintiff avers that he first learned that his phone PIN was blocked on January 25, 2023, when he "attempted to contact [his] attorney by phone." Dkt. No. 176 at ¶2. He avers that he spoke with Lieutenant Beauvais, who he says blocked his PIN based on Beauvais's determination that the plaintiff had misused the phone system. Id. The plaintiff avers that he told Beauvais that he "needed to call [his] attorney as soon as possible," but that Beauvais told him "to write to [his] attorney instead." Id. The plaintiff says that he "repeatedly told officers and Lt. Beauvias [*sic*]" that he had a court hearing on January 26 and that he "needed to call [his] attorney Amber R. Gratz from Fox River Law LLC." Id.

The plaintiff says that on January 26, 2023, he filed a grievance about this issue, and reiterated that he "needed to call [his] attorney." Id. at ¶2. He says that Tracey Kaphingst (not a defendant) responded to this grievance, but not until February 1, after the plaintiff's phone restriction had been lifted. Id. The plaintiff does not cite the grievance, but the court was able to locate it in the exhibits the plaintiff included with his second motion for summary judgment. Dkt. No. 134-1 at 13. The plaintiff avers that he did not see Gratz on January 26 before his court hearing. Dkt. No. 176 at ¶2. He says that he did have "a professional visit" at the jail before his hearing on January 26, but he says that

"it was not Ms. Gratz or anyone from her office." Id.; Dkt. No. 176-1 at 7. He does not identify the person with whom he had this professional visit.

The plaintiff avers that on January 27, 2023, he submitted a request stating that it had been forty-eight hours since he was able to call his attorney, and he claimed that his "rights ha[d] been violated, and [were] continuing to be violated, [his] choice after this [was] Federal Civil Court." Dkt. No. 176 at ¶5. He avers that this request "was not answered or even opened by staff until February 2, 2023," after he was transferred to Brown County Jail. Id. The plaintiff did not provide a record citation for this request, but again the court was able to locate it in exhibits the plaintiff included with his second motion for summary judgment. Dkt. No. 134-1 at 3.

The plaintiff avers that during his January 27, 2023 disciplinary hearing, he told Lieutenant Willson that he needed to call his attorney, and "Willson told [him] to write to [his] attorney." Dkt. No. 176 at ¶6. The plaintiff cites the jail's rulebook; he says that nowhere in that rulebook does the book state "what to do if your pin number is blocked, or disabled, nor does it state how to contact your attorney." Id. at ¶7; Dkt. No. 176-1 at 2–3. (The rulebook does state, "Problems arising from abuse or misuse may result in phone privileges being restricted or denied." Dkt. No. 176-1 at 3.)

The plaintiff avers that on January 29, 2023, he spoke with Lieutenant Evens about contacting his attorney using the kiosk because "there is no longer any paper request forms to write on for the Public Defender's Office." Dkt. No. 176 at ¶8. He reiterates that the rulebook does not provide information about

detainees being able to write to their attorneys using the kiosk or how to contact their attorneys if their PIN is blocked or disabled. Id. at ¶10; Dkt. No. 176-1 at 4. The plaintiff avers that later in the day on January 29, he submitted a request to the public defender's office using the kiosk, but that his request "was not answered until January 31, 2023 . . . after [he] said something to the Jail Staff." Dkt. No. 176 at ¶11. He says that he has "no idea if Ms. Gratz ever received this message," and the witness he asked her to call at his preliminary hearing "was never called to the stand." Id.

The plaintiff avers that on January 31, 2023, he filed a request to Captain Schmidt informing him that the plaintiff had told Willson and Beauvais and "written on the tablet" that the plaintiff needed to call his attorney, but the lieutenants "ignored [his] request." Id. at ¶14. Schmidt responded and told the plaintiff that Schmidt "sent an email to all of the Lieutenants making them aware of this." Id. The plaintiff says that he still was not able to call his attorney. Id. The plaintiff did not provide a record citation for this request, but the court was able to locate it in the exhibits the plaintiff included with his second motion for summary judgment. Dkt. No. 134-1 at 9. The plaintiff avers that Schmidt also responded to the plaintiff's appeal from his disciplinary hearing and told the plaintiff that he could "write a letter" to his attorney or the public defender "if so desired." Dkt. No. 176 at ¶14; Dkt. No. 165-5. Schmidt also explained the jail's policy allowing detainees to contact their attorneys by providing the attorney's name and telephone number for staff to verify and "provide an exception to that number." Dkt. No. 165-5 at 2.

The plaintiff avers that even if he could have written to his attorney while his phone access was restricted, he "was in fact indigent, and did not have money to buy pen, paper, or even an envelope so [he] could write to [his] attorney." Dkt. No. 176 at ¶16. He reiterates that he "did not have direct contact with [his] attorney for the entire 7 days" despite trying "to follow the direction laid out . . . in the OCJ Inmate Rulebook." Id.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005). The nonmoving party must provide more than allegations to defeat a motion for summary judgment;

he must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." Siegel v. Shell Oil Co., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).

      B.    Sixth Amendment

     The court explained the applicable law in the screening order and in the order denying the plaintiff's first motion for partial summary judgment. In the screening order, the court explained, "The Seventh Circuit has held that '[r]estrictions on a detainee's telephone privileges that prevented him from contacting his attorney violate the Sixth Amendment right to counsel.'" Dkt. No. 14 at 14 (quoting Murphy v. Walker, 51 F.3d 714, 718 (7th Cir. 1995); and citing Tucker v. Randall, 948 F.2d 388, 390–91 (7th Cir. 1991)). In its order ruling on the plaintiff's first motion for partial summary judgment, the court wrote that "the Seventh Circuit also explained that state officials could avoid liability if they 'identify legitimate reasons, security or otherwise, for limiting [detainee's] access to a telephone.'" Dkt. No. 90 at 15 (quoting Murphy, 51 F.3d at 718; and citing Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988)); see also Lashbrook v. Hyatte, 758 F. App'x 539, 541 (7th Cir. 2019) (noting that "prisons may restrict prisoner contact with counsel so long as the restrictions reasonably relate to legitimate penological interests"). The court recounted that the Seventh Circuit had "held that '[d]enying a pre-trial detainee access to a telephone for four days would violate the Constitution *in certain circumstances*.'" Dkt. No. 90 at 15 (quoting Tucker, 948 F.2d at 390 (emphasis added)). The court concluded that "[t]hese cases stand for the proposition that

a pretrial detainee's Sixth Amendment right to speak with his attorney over the phone while incarcerated is not unlimited." Id.

C.   Analysis

The court allowed the plaintiff to proceed on a narrow Sixth Amendment claim that Lieutenants Willson and Beauvais violated his right to counsel when they "ignored or disregarded his requests to contact his attorney" after jail staff blocked his phone PIN. Dkt. No. 14 at 14–15. The court did not allow him to proceed on a First or Fourteenth Amendment claim related to the restriction itself or on a claim related to his grievances or disciplinary hearing. Id. at 6, 14.

The defendants assert that the plaintiff's one-week phone restriction was a reasonable penalty based on his violation of jail rules. Dkt. No. 168 at 1. They contend that even while he was on that restriction, the plaintiff could have contacted his attorney by writing to her, submitting a request at the jail for a call with her, submitting a request to speak with her through the public defender's office using the kiosk or meeting with her in person. Id. at 2. The defendants say that the Sixth Amendment right to counsel is not absolute, and they assert that there was no violation here because the plaintiff was able to contact his attorney in person and by using the kiosk. Id. The defendants also maintain that even if the plaintiff's rights were violated, neither Willson nor Beauvais was personally involved in that violation because their "limited actions . . . regarding [the plaintiff's] telephone privileges did not in any way infringe on [his] ability to access his attorney." Id. They contend that they "did not ignore or disregard any

requests from [the plaintiff] to contact his attorney." Id. at 10. Finally, the defendants argue that they are entitled to qualified immunity. Id. at 2.

The defendants say that despite his one-week phone restriction, the plaintiff had contact with Attorney Gratz several times during that week. First, they assert that on January 26, 2023, the plaintiff had an in-person visit with Gratz at the jail before his court hearing. In support, they cite the listing for this visit in the jail's management system, but as the court explained above, this listing says only that the plaintiff had a "professional contact visit" with "attorney." Dkt. No. 165-9. Gratz's name does not appear on this listing, unlike the listings for the plaintiff's visits with Gratz on January 24 and February 1. Dkt. Nos. 165-8, 165-10. These notices list different officers under the "Officers Involved" sections. Dkt. Nos. 165-8, 165-9, 165-10. That suggests that different staff recorded different information under "Additional Info."

The defendants also assert that because the courthouse is adjacent to the jail, Gratz "had the opportunity to meet with" the plaintiff before the court hearing. Dkt. No. 166 at ¶27. But the defendants have cited no evidence showing that Gratz was the "attorney" who visited the plaintiff at the jail on January 26 before his court hearing. They did not provide a statement from Gratz averring that she met with the plaintiff on January 26, and the plaintiff says that he met with a different attorney, though he does not say who this person was or why a different attorney met with him minutes before a court hearing at which he was represented by Gratz. Although the reasonable inference is that Gratz was the "attorney" who met with the plaintiff on January

26, the evidence does not show that it was Gratz. And even if Gratz had the opportunity to meet with the plaintiff, the defendants have provided no proof that Gratz knew that the plaintiff wanted to speak with her before the hearing.

The defendants next argue that the plaintiff had the opportunity to speak with Gratz at the January 26, 2023 court hearing. They assert that during that hearing, the plaintiff could have asked Gratz to call him or come see him (even if she had seen him at the jail minutes before the hearing). They recount that during this hearing, neither Gratz nor the plaintiff said anything about the plaintiff's phone restriction, and the plaintiff did not ask Gratz to call or visit him. But this hearing lasted two minutes at most. Dkt. No. 162-1 at 2 (reflecting a start time of 10:38 a.m. and a concluding time of 10:40 a.m.). And the plaintiff—who was present via video—did not speak at all during the hearing. This hearing was a brief, housekeeping discussion at which the court scheduled the preliminary hearing. The fact that the plaintiff and Gratz both were present during this hearing (albeit not in the same room) does not show that the plaintiff had meaningful contact with Gratz.

The defendants next assert that the plaintiff was able to contact Gratz electronically through the kiosk. There *is* evidence that on January 29, 2023, the plaintiff was able to send a message to Gratz by submitting a request to the public defender's office through the jail's kiosk. Dkt. No. 165-7. The evidence shows that the plaintiff told Gratz that he wanted her to call a witness at his preliminary hearing and that the jail had restricted him from calling her. Id. The public defender's office responded two days later; the response says that

28

the office had forwarded the plaintiff's message to Gratz. Id. The plaintiff concedes that during his one-week phone restriction, he was able to contact the public defender's office using the kiosk after a non-defendant lieutenant informed him about that process. The defendants conclude that the plaintiff must have known that he could contact Gratz through the kiosk because on January 15, 2023—before Gratz was appointed to represent him—the plaintiff submitted a request to the public defender's office seeking an attorney. Dkt. No. 183-2. But there is a difference between the plaintiff knowing that he could use the kiosk to contact *the public defender's office* and knowing that he could use it to reach *his attorney* by going *through* the public defender's office.

It is immaterial who told the plaintiff that he could contact his attorney through the kiosk while his PIN was restricted or when he learned that he could reach Gratz by sending a message through the public defender's office. It is undisputed that on January 29, 2023, four days into his one-week phone restriction, the plaintiff used the kiosk to attempt to reach Gratz by sending a message to the public defender's office for them to forward to her about a witness that he wanted to testify at his preliminary hearing. The plaintiff says it is not known whether Gratz received his message. The defendants assume—but cite no evidence showing—that Gratz received the plaintiff's message. The record contains no declaration from Gratz confirming or denying that she received that message. The plaintiff says that even if she did receive the message, he did not call the witness at his preliminary hearing because he had insufficient time to subpoena or prepare the witness to testify before the

February 3 hearing. It is possible that Gratz did not get the January 29 message and, before February 1, was not aware of the witness that was the subject of the plaintiff's January 29 message to her. But it is just as possible that Gratz did receive the plaintiff's message and decided not to call the witness or was unable to find the witness.

The defendants next assert that there is no evidence showing that the plaintiff ever submitted a request to have Gratz's number unblocked and providing her name and telephone number to jail staff, a procedure that is laid out in the rulebook. Dkt. No. 165-1 at 11. The plaintiff says the rulebook does not say that detainees can submit these requests through the kiosk rather than on paper, and he says that the jail no longer had paper requests to send to the public defender's office in 2023. Dkt. No. 176 at ¶¶9–10. Although the plaintiff is correct that the language in the rulebook does not specify that detainees on a phone restriction still can follow this procedure or submit attorney requests through the kiosk, there also is no language preventing the plaintiff from asking jail staff to add Gratz's name to his list for unrecorded calls because he was on a phone restriction. The evidence suggests that this is a method the plaintiff could have used to reach Gratz, but that he did not attempt to use it.

Finally, the defendants assert that the plaintiff could have written to his attorney at any time, despite his claim that he was indigent. They state that the jail offers "write out kits" that would have provided the plaintiff "the supplies necessary for an inmate to write to an attorney." Dkt. No. 184 at 5–6. The

plaintiff previously had requested these kits while he was at the jail in 2017 and 2018, and he requested one during an incarceration at the jail in 2023. Dkt. No. 183-1. Although the plaintiff likely was aware that he could request one of these kits to obtain the supplies necessary to write to his attorney, the defendants have identified no evidence suggesting that Gratz would have received the plaintiff's correspondence within the one-week phone restriction and been able to respond to his requests before his February 3, 2023 hearing. Even if the plaintiff was afforded this manner of contacting his attorney, it is unclear what practical use it would have been to him during his brief phone restriction.

The parties' conflicting evidence creates a dispute of fact regarding whether the plaintiff met with Attorney Gratz in person or communicated with her in any way during his one-week phone restriction. A reasonable jury viewing the evidence could conclude that the plaintiff likely met with Gratz in person on January 26, 2023, before his court hearing. But the evidence also would allow a jury to conclude that rather than meeting with Gratz on that day, the plaintiff met with a different attorney, even though there is no evidence suggesting who that attorney was. A reasonable jury could find that the plaintiff had other means of reaching Gratz, including by forwarding her a message through the public defender's office using the kiosk, by writing to her or by asking the jail to add her to his call list. But a reasonable jury also might conclude that the plaintiff was not able to contact Gratz for the full week. If a jury were to find that the plaintiff was not able to contact Gratz during the

entire week, the question for the court would be whether the disciplinary phone restriction violated the plaintiff's Sixth Amendment rights. If not, then judgment is proper for defendants Willson and Beauvais. If so, then judgment is not proper for either party, and the case must go to a jury so that it may determine whether the plaintiff had any opportunity to communicate with Gratz while he was on his one-week phone restriction.

The court finds itself in the same place it did in deciding the plaintiff's first motion for partial summary judgment on his Sixth Amendment claim. But in contrast to that decision, in ruling on the defendants' motion the court does not end its analysis here. Defendants Willson and Beauvais did not move for summary judgment in response to the plaintiff's first motion for summary judgment against them, and they did not raise any affirmative defenses. The defendants now have moved for summary judgment, and they assert that even if the plaintiff's version of the facts is correct, they are entitled to qualified immunity. Dkt. No. 168 at 16–19. The court finds that it need not determine whether the lieutenants' actions violated the plaintiff's Sixth Amendment rights because even if the plaintiff's version of the facts is correct, the Sixth Amendment right he asserts was not clearly established at the time of the events. That means the defendants are entitled to qualified immunity.

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Figgs v. Dawson, 829 F.3d 895, 905 (7th Cir. 2016) (quoting Pearson v.

Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)).

Qualified immunity is an affirmative defense. To defeat the defendants'

assertion of qualified immunity, the plaintiff must show that 1) the defendants

violated his constitutional right, and 2) the right at issue was clearly

established at the time of the violation. Pearson, 555 U.S. at 232. The plaintiff

"bears the burden of convincing the court that a clearly established

constitutional right existed at the time of the actions in question." Sherman v.

Four Cnty. Counseling Ctr., 987 F.2d 397, 408 (7th Cir. 1993). If the plaintiff

fails to satisfy either inquiry, the defendants are entitled to qualified immunity.

See Muhammad v. Pearson, 900 F.3d 898, 904 (7th Cir. 2018) (citing Gibbs v.

Lomas, 755 F.3d 529, 537 (7th Cir. 2014)). The court may decide these factors

in either order. McComas v. Brickley, 673 F.3d 722, 725 (7th Cir. 2012) (citing

Pearson, 555 U.S. at 236–42). That means if the plaintiff fails to satisfy either

element, then the defendants are entitled to qualified immunity. Id.

　　　　For purposes of qualified immunity, the court must view the evidence in

the light most favorable to the plaintiff because he is the nonmoving party.

See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019). As the court

explained above, a reasonable jury could accept the plaintiff's version of events

that he did not speak with Gratz during his one-week phone restriction. But it

is undisputed that the plaintiff had other avenues for communicating with

Gratz during his phone restriction—in-person visits, sending her a message

through the public defender by using the kiosk and writing to her. To be clearly

established, the right that the defendants allegedly violated "must be

established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." <u>Reichle v. Howards</u>, 566 U.S. 658, 665 (2012) (cleaned up). In other words, "the right in question is not the general right" to counsel under the Sixth Amendment, "but the more specific right" of a pretrial detainee to speak with counsel on the phone even though other avenues of communication with his attorney exist. <u>Id.</u>

The court has not found any case law clearly establishing a pretrial detainee's Sixth Amendment right to call his attorney via telephone even though he has other options for communicating with counsel, such as through in-person visits, electronic communications or writing letters. As the court explained above and in the previous orders, binding Seventh Circuit authority holds only that restrictions on a detainee's telephone privileges that prevent him from contacting his attorney may violate his Sixth Amendment rights "in certain circumstances," such as where a detainee is "not allowed to talk to his lawyer" at all for several days, <u>Tucker</u>, 948 F.2d at 390; or where there are no legitimate penological reasons for limiting his phone use, <u>see</u> <u>Martin</u>, 845 F.2d at 1458.

The court has found no binding, Seventh Circuit authority detailing what "circumstances" might constitute a violation a detainee's Sixth Amendment right to counsel when that detainee's phone privileges are restricted. But decisions from several other district courts shed light on that question. Most recently, another court in this district rejected a detainee's Sixth Amendment claim that he was denied access to his attorneys. <u>Dunham v. Willmann</u>, Case

No. 22-CV-1033, 2025 WL 578485, at *3 (E.D. Wis. Feb. 21, 2025). The evidence in that case showed that from April 6 to June 29, 2022, twenty-one of the detainee's requests to call his lawyers "were denied because of [a] phone restriction." Id. But "the undisputed evidence still show[ed] that he communicated with his lawyers at least seven times during that period, including in person visits, phone calls, and written correspondence." Id. Unlike the plaintiff in this case, that detainee was able to speak with his attorney on the phone on some occasions. But the evidence showing that the detainee in Dunham was not entirely cut off from communications with counsel weighed against the court finding that his Sixth Amendment rights were violated by the phone restriction during that nearly three-month period. Id.

A district court in Indiana found no Sixth Amendment violation where the detainee alleged that he was not allowed to see his attorney in person for two days while his unit was on lockdown. Lunford v. Zawitowski, Case No. 22-CV-78, 2022 WL 558334, at *2 (N.D. Ind. Feb. 23, 2022). The court observed that this was a shorter time than "the period identified in Tucker as giving rise to constitutional concerns." Id. But the court found it more important that there were no facts allowing an inference "that the jail cut off other means of communication between [the detainee] and his attorney, such as phone calls or letters." Id. The court found that limiting only one method of communication between the detainee and his attorney—face-to-face visits—did not violate the detainee's Sixth Amendment rights. Id.

Similarly, in Porter v. Bodlovich, Case No. 94CV0889, 1996 WL 535436, at *12 (N.D. Ind. Sept. 17, 1996) (adopting report and recommendation), the court found no Sixth Amendment violation because the evidence did not show that the detainee "was prevented from communicating with his attorney during [a] lockdown." The evidence showed that during the nearly one-month lockdown at the facility, the jail had a procedure allowing a detainee to make phone calls by showing staff "a letter from his attorney requesting the contact." Id. Because there was no evidence proving that the detainee showed staff a letter from his attorney requesting a call, the court found no Sixth Amendment violation despite the detainee's inability to speak with his attorney during the entire lockdown. Id. A district court in Illinois likewise found no Sixth Amendment violation of a detainee's rights despite allegations that she could not make any calls for four days because the evidence showed that she "was not held incommunicado; she had regular access to her lawyer during a handful of court appearances during her detention." Stead v. Skinner, Case No. 10 C 4526, 2011 WL 3882809, at *4 (N.D. Ill. Sept. 2, 2011).

Perhaps most enlightening is the decision of the district court in Tucker on remand from the Seventh Circuit. Tucker v. Randall, 840 F. Supp. 1237, 1246 (N.D. Ill. 1993). That court reiterated the detainee's argument "that he was denied access to the telephone for the first 67 hours of his incarceration." Id. The court explained that

> [i]n order to determine whether this denial of access constituted a constitutional violation, we must look to "the 'clearly established' law in 1986 when the alleged violation occurred. At that time, the courts had found two areas in which denial of phone access

produced a constitutional violation: (1) where it significantly affected the detainee's ability to receive calls from his attorney and to prepare his defense, and (2) where telephone access was denied almost entirely or on a long term basis with no reasonable relation to a valid security interest.

Id. (internal citations omitted). The court found that neither of those situations was present. Id. The detainee's attorney represented him "at a bond hearing one or two days after [the detainee] was incarcerated and also had a conference with [him] at the jail within two or three days." Id. The detainee also admitted that he had phone access by the fourth day at the jail. Id. Under those circumstances, the court determined that the defendants did not violate "a 'clearly established,' particularized law at the time of the alleged violation that would preclude a qualified immunity defense on this issue." Id.

The same conclusion is appropriate here. The undisputed evidence shows that the plaintiff was not "incommunicado," and the jail did not entirely prevent him from communicating with his attorney while on a phone restriction. The evidence shows that during the time that the plaintiff was restricted from using the phone because of a valid disciplinary conduct violation, he had other ways to reach Gratz. The plaintiff could have had an in-person meeting with her, and it is possible he did meet with Gratz on January 26, 2023. The plaintiff says he met with a different attorney and not Gratz. But it is undisputed that he had a professional visit from an attorney during his phone restriction, which means he also *could have* met with Gratz during that time. He also met with Gratz on January 24 (one day before the restriction went into effect), at which time he could have asked her to return before his January 26 court hearing; and he saw

her on February 1 (the day after the restriction was lifted), two days ahead of his February 3 court hearing. There is no evidence suggesting that the jail prohibited the plaintiff from meeting with Gratz in person during his phone restriction.

It also is undisputed that the plaintiff had other ways to reach Gratz. The evidence shows he could have requested a write-out kit to send letters to Gratz. Even if the letter might not have reached Gratz before the plaintiff's February 3 hearing, the evidence shows that the jail did not prohibit him from writing to her. To the contrary, the plaintiff says that Willson and Beauvais (and others) repeatedly told him that he *could* write to her. It is undisputed that the plaintiff could have had a message sent to Gratz through the public defender's office by using the kiosk, and the plaintiff *did* send a message to her using this option. The plaintiff insists there is no way of knowing whether Gratz received his message about having a witness testify at his February 3 hearing. But that is not the point; the evidence shows that jail did not prohibit the plaintiff from contacting his attorney using this method. Finally, the plaintiff could have followed the procedure in the rulebook for having Gratz added to his contact list. Although he says he repeatedly grieved his inability to call Gratz, the plaintiff has identified no evidence that he submitted a written request to have Gratz added to this list for unrecorded calls. This shows that the plaintiff had other methods of communicating with counsel, methods that he did not choose to use.

Nor is there any evidence that the plaintiff's one-week phone restriction impeded his ability to prepare his defense. The plaintiff asserts in his response

38

brief that if he had been allowed to call Gratz, he "could have been home by now." Dkt. No. 175 at 3. That suggests the plaintiff believes that without this one-week phone restriction early in his state criminal case, he would have been acquitted and released from incarceration. But he neither cites nor provides any evidence showing how or why things would have been different if he had been allowed to call Gratz during this one week in addition to sending her letters or messages through the kiosk and despite having in-person visits with her on January 24 and February 1, 2023. The plaintiff's "'[c]onclusory allegations of prejudice are insufficient'" to demonstrate a Sixth Amendment violation. <u>Dunham</u>, 2025 WL 578485, at *3 (quoting <u>Carter v. O'Sullivan</u>, 124 F.3d 203 at *2 (7th Cir. June 30, 1997); and citing <u>Martin v. Davies</u>, 917 F.2d 336, 340 (7th Cir. 1990)).

The court has not found any "'clearly established,' particularized law" in this circuit as of January 2023 holding that a disciplinary restriction that limits a detainee's phone access to his attorney for one week, during which time there were other avenues for him to communicate with his attorney, violates his Sixth Amendment right to counsel. Nor does the plaintiff cite any binding authority that says so. The court has found only non-dispositive, district court cases concluding that a detainee's Sixth Amendment right was not violated in similar circumstances. The fact that the plaintiff's phone restriction was imposed for a legitimate security or disciplinary reason strengthens the court's conclusion. It is undisputed that the plaintiff had other ways to contact Attorney Gratz during his one-week phone restriction. That the plaintiff did not take advantage of these

other avenues does not mean that the lieutenants violated his Sixth Amendment right because there is no evidence that they (or anyone) kept the plaintiff from pursuing these other means of contacting her. Because the plaintiff has not shown that the right he asserts was clearly established at the time of the events, Willson and Beauvais are entitled to qualified immunity. The court will grant their motion for summary judgment and dismiss the case.

As a final note, the plaintiff maintains "that he did not misuse the telephone system," despite his apparent concession to the violation as described in the disciplinary report. Dkt. No. 175 at 2. The plaintiff appears to argue that because he did not misuse the phone system, the jail cannot rely on his disciplinary conduct report to justify his phone restriction. But it is undisputed that at the plaintiff's January 27, 2023 disciplinary hearing, Willson found the plaintiff guilty of misusing the phone. The court has explained that the plaintiff's disciplinary charges and conviction are not at issue in this lawsuit, nor could they be. The plaintiff cannot use a §1983 lawsuit to challenge his disciplinary conviction or sentence; for that, he must file "a habeas petition under 28 U.S.C. § 2254." Wilks v. Rymarkiewicz, 667 F. App'x 549, 551 (7th Cir. 2016) (citing Preiser v. Rodriguez, 411 U.S. 475, 500 (1973), and Walker v. O'Brien, 216 F.3d 626, 633 (7th Cir. 2000)).

## III.    Conclusion

The court **DENIES** the plaintiff's motion for partial summary judgment. Dkt. No. 132.

The court **GRANTS** the defendants' motion for summary judgment and **DISMISSES** defendants Willson and Beauvais. Dkt. No. 161.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **thirty days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court*. See Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **twenty-eight days** of the entry of judgment.

The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 23rd day of June, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**